IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 22, 2015

## STATE OF TENNESSEE v. JUSTIN ALLEN STRATTON

**Appeal from the Criminal Court for Washington County**
**No. 37485    Robert E. Cupp, Judge**

**No. E2014-00816-CCA-R3-CD - Filed April 17, 2015**

The Defendant, Justin Allen Stratton, was convicted of first degree premeditated murder by a Washington County Criminal Court jury.  *See* T.C.A. § 39-13-202 (2014).  He was sentenced to life in prison.  On appeal, he contends that the evidence is insufficient to support his conviction and that plain error exists because the jury was not instructed regarding corroboration of accomplice testimony.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined.  D. KELLY THOMAS, JR., J., filed a concurring opinion.

Larry R. Dillow, Kingsport, Tennessee, for the appellant, Justin Allen Stratton.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Anthony W. Clark, District Attorney General; and Dennis Brooks and Erin McArdle, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the July 30, 2011 homicide of Gary A. Couch, Jr., who was found dead in a public road.  He had multiple gunshot wounds, as well as injuries to his face and head.  Along with the Defendant, Ashley Harold, Ginger Holtsclaw, and Anthony Phillips were charged with the victim's homicide, and the codefendants testified for the State at the Defendant's trial.  At the time of their testimony, Ms. Holtsclaw and Mr. Phillips had received plea offers that included dismissal of the murder charges in exchange for their guilty pleas to robbery-related offenses and their truthful testimony at the Defendant's trial, but Ms. Harold had not.

Johnson City Police Officer Robert McCurry testified that as a result of a 9-1-1 call, he responded to Quarry Road around 4:00 a.m. on July 30, 2011. He described Quarry Road as being short, infrequently traveled, and with foliage on the sides. As he came onto Quarry Road, he saw a body in the road. Officer McCurry said that although the person was deceased, it was obvious the body had not been there long because it had not turned cold. Spots of blood were still wet. The chest and abdomen had what appeared to be bullet holes. The face was distorted, the jaw appeared to have been run over by a vehicle, tire tracks were on the body, and teeth were strewn around the body.

Johnson City Police Investigator Bobby Odom described the scene using photographs he took on the morning of July 30. He said that a pistol's rear sight was found near the victim's head and that it was not rusted, which indicated it had not been there long. He said the victim wore a white tank top, jeans, and one shoe. Another shoe was off the body, and a cap was off the body near the back of the head. He said bullet holes in the victim's tank top were encircled by a black burn, which indicated a gun had been fired while in contact with the shirt. He said the victim had a black smudge or grease mark on the right side of his face that extended to his chin. The victim's upper lip was torn, his right eyelid was cut, and some of the teeth were missing or broken.

Dr. Dawn Lajoie, an expert in forensic pathology, performed the autopsy of the victim. She said the victim suffered eight gunshot wounds and blunt force injuries that included deep and superficial lacerations, abrasions, jaw fractures, and jaw dislocation. Based upon the color of the victim's injuries, she said evidence existed that the victim's heart was still beating when the blunt force injuries were sustained. She said the injuries to the victim's face and jaw were consistent with his having been run over or struck by a vehicle tire. Although she said the injuries could have been from a different source, she said an alternative source was unlikely. When asked about "pistol whipping," she did not think a person could produce enough force to inflict injuries as severe as those the victim sustained. In addition to the severity of the injuries, she noted the presence of black and gray foreign material supported her opinion the victim had been run over by a vehicle. She stated that the victim's cause of death was multiple gunshot wounds, including one to the aorta, and that the manner of death was homicide.

Regarding the hours before the victim's body was discovered in Quarry Road, the evidence showed that Ms. Harold, Ms. Holtsclaw, and Mr. Phillips drank liquor with the Defendant in the afternoon or evening of July 29, 2011, at the Defendant's mother's house. They rode around in Ms. Harold's white Chevrolet Impala and ended up at Numan's Bar. When they arrived, Mr. Phillips and the Defendant went to the bar, and Ms. Harold and Ms. Holtsclaw stayed in the car for ten to fifteen minutes.

Ashley Harold testified that she changed clothes in the car before going inside Numan's with Ms. Holtsclaw. She said she did not see the Defendant or Mr. Phillips inside the bar. She said she and Ms. Holtsclaw met the victim, whose nickname was "Goob" and whom she had not known previously, inside Numan's. She thought the victim was interested in her. She said that the victim was looking for money, that he had lost money playing pool, and that she did not remember if she saw him with money. She said that the victim asked her for a ride. She did not recall when they left but said it was late and thought it was after "last call." She said she was intoxicated and let Ms. Holtsclaw drive her car. She said the victim offered to buy gas, and they went to Sunoco.

Ms. Harold testified that she and the victim went inside Sunoco. The victim went in the bathroom, and at some point, she asked through the bathroom door if he wanted to share a pack of cigarettes. She said he was on the phone and rudely told her, "Shut up." She said that she went to the car and that she saw Mr. Phillips outside talking to his sister by the sister's car. She said she did not talk to Mr. Phillips. She did not know if Ms. Holtsclaw contacted Motel 6 before they left Sunoco.

Ms. Harold testified that when they left Sunoco, Ms. Holtsclaw drove, she was in the passenger seat, and the victim was in the back seat. She said they were nervous about going to the victim's house because of the distance, and Ms. Holtsclaw said they could go to Ms. Holtsclaw's house to get clothes and "sober up." Ms. Harold said Ms. Holtsclaw talked on a cell phone, but Ms. Harold did not remember to whom or the content of the conversation. She said they turned onto Quarry Road, and a large, white vehicle came upon them quickly. She said the vehicle had bright, blinking lights. She said Ms. Holtsclaw stopped the car. Ms. Harold said she and the victim were in shock. She saw the Defendant come from the other vehicle and approach the driver's side of her car. She said that the Defendant told the victim to get out of the car and that as soon as the victim did, she saw gunfire. She identified the Defendant as the person holding the gun. She said she closed her eyes, panicked, and screamed for Ms. Holtsclaw to drive away. She did not think she saw anyone else in the other vehicle.

Ms. Harold testified that Ms. Holtsclaw pulled away quickly and that they went to the Defendant's mother's house. She said that the Defendant and Mr. Phillips pulled in behind them and that she had not seen Mr. Phillips previously. She said that the Defendant said something to his mother, which she thought pertained to what he had done, and that the Defendant told Ms. Harold to "chill out," "straighten up," and stop crying. She said the Defendant stated, "This wasn't my first, this wasn't my first or second, don't be my third, fourth or fifth." She said the Defendant told them they needed to keep their mouths shut because he knew where they lived and where their children attended school. She said she

was scared and did not want to go home and lead someone to her house and children. She said she took the threat seriously and did not notify the authorities.

Ms. Harold testified that the Defendant wanted Ms. Holtsclaw and her to follow him in her car to a motel. She said they went to the motel and stayed a couple of nights. She acknowledged that she used her cell phone to check on her family and to keep them from wondering where she was but that she did not call the police. She said she, Ms. Holtsclaw, Mr. Phillips, and the Defendant had gone to Perkins Restaurant after arriving at the motel but said she was unable to eat or sleep while they were at the motel.

Ms. Harold testified that she, Ms. Holtsclaw, and the Defendant were in her car and were stopped by the police a couple of days after the shooting. She said the Defendant cautioned Ms. Holtsclaw and her to remember what he had said. She said she told the police when questioned that they stopped at a park to smoke marijuana, that they dropped off the victim at the park near Sunoco, and that she did not know anything else. She said that the false statement was in accord with the Defendant's instructions and that she did not tell the truth because she did not know if the Defendant would be allowed to leave the police station. She said that the police contacted her a few days later, that she told the truth, and that telling the truth was easy because the Defendant had been arrested by this time.

Ms. Harold testified that at the time of the crime, she had been associating with the Defendant for about two months, although she had known him when they were younger. She agreed she had known Ms. Holtsclaw and Mr. Phillips since high school and said she was thirty-one years old. She said that at one time, she and Mr. Phillips had an intimate relationship. She said she had been with him earlier in the day before they went to Numan's with Ms. Holtsclaw and the Defendant. She said she and Mr. Phillips had a disagreement before they went to Numan's but denied the reason she did not talk to Mr. Phillips's sister at Sunoco was related to her being with the victim that night. She denied having an intimate relationship with the Defendant.

Ms. Harold testified that she did not have a plea agreement with the State. She thought her case would go to trial and said she was not guilty of anything. She said she did not know what was going to happen to the victim. She said she had no criminal record and had a juvenile adjudication for theft.

Anthony Phillips testified that he and the Defendant had been acquaintances for about fifteen years and that he thought they were friends on July 30, 2011. He had been a childhood friend of the Defendant's brother. He said he had known Ms. Harold and Ms. Holtsclaw since they had attended high school together over ten years earlier, but he had not been friends with them until later. He said he had an "on and off" boyfriend-girlfriend

relationship with Ms. Harold. He thought he had been spending time with Ms. Harold and Ms. Holtsclaw before he met the Defendant about four to five weeks before the shooting.

Mr. Phillips testified that on July 29, 2011, he, Ms. Harold, Ms. Holtsclaw, and the Defendant were riding around in Ms. Harold's car and drinking Wild Turkey. He said they stopped at Numan's. He said that he and the Defendant went into Numan's, that he entered through the front door, and that the Defendant entered through the back door. He said that sometime later, he saw the Defendant outside and that the Defendant told him about an altercation between the Defendant and Robert "Mookie" Racanelli regarding a stolen PlayStation game console. The Defendant told Mr. Phillips to leave him alone for a while, and the Defendant walked toward Main Street. Mr. Phillips said he stayed at some tables outside Numan's after the Defendant left. He said he had "a good buzz" when the Defendant pulled up in a white sport utility vehicle (SUV) about one to one and one-half hours later. Mr. Phillips had seen the car previously at a car lot and had noticed it because of its wheels. He said that the Defendant sometimes drove cars from the car lot in exchange for crack cocaine the Defendant gave to the lot's owner. Regarding a black Mercedes-Benz sedan, he said that he had seen the car previously and that he understood the Defendant was its former owner. He said he had not known that night that the SUV and the Mercedes were stolen.

Mr. Phillips testified that he got in the SUV when the Defendant returned to Numan's. He said he and the Defendant rode around drinking one of the two bottles of Maker's Mark the Defendant had. He said that his fingerprints might be on the SUV's license plate because it had fallen off when they rode around and that he had replaced it. He said they were supposed to get pain pills from Goob, although Mr. Phillips did not know whom the Defendant meant by Goob. He said that the Defendant did not tell him anything the Defendant had done and that they did not discuss anything else they would do. He said, "We rode around until up in the middle of the night until Ms. Holtsclaw called us and until we met them." He later said, "We [were] called to meet them [at Sunoco]," and "We ended up there when he got a phone call, that's where we went." He said Ms. Holtsclaw, Ms. Harold, and the victim were in the white Impala at the gas pumps when he first saw them. Mr. Phillips said that when they arrived, the Defendant was talking on a cell phone but that he was not listening to the Defendant's conversation. He said the Defendant pulled into a car wash with a parking lot adjoining Sunoco, parked, and talked on the cell phone. He said the SUV was parked facing Sunoco and that the white Impala was visible from where they were parked. He thought only Ms. Holtsclaw was in the Impala when they pulled up. He said that he got out of the SUV when he saw his sister's car at Sunoco and that the Defendant continued his cell phone conversation. He talked to his sister for a few minutes inside the store and beside her car until Ms. Harold, Ms. Holtsclaw, and the victim started to leave. He said he realized the SUV was leaving and assumed "the deal was done done." He said he had not met the victim but realized at Sunoco who Goob was. He said he did not know anything about Ms.

Holtsclaw's calling Motel 6 or about Ms. Holtsclaw, Ms. Harold, and the victim's plans. He said he did not talk to Ms. Harold at Sunoco because he thought she was still mad at him from the disagreement they had earlier. He denied that it bothered him that she was with the victim and said his relationship with Ms. Harold was "just a fling."

Mr. Phillips testified that the Defendant followed the white Impala. He said the Defendant talked to Ms. Holtsclaw by cell phone and told her which direction to go. He said that at Quarry Road, the Defendant flashed the SUV's lights for Ms. Holtsclaw to stop. He said the Defendant acted nervous, got out of the SUV, and went to the driver's side rear door of the Impala. Mr. Phillips that said the victim got out of the Impala and that as soon as the victim stood, the Defendant shot him. He said the victim screamed and asked why "Puff" was shooting him. The evidence showed that Puff was the Defendant's nickname. Mr. Phillips said the Defendant shot the victim three times, shoved the victim down, stood over him, and shot him again. Mr. Phillips said that when the Defendant shoved the victim, the Defendant grabbed the victim's t-shirt. Mr. Phillips said that he had not known the Defendant had a gun that night but that he had seen the gun at the Defendant's mother's house. He said the Impala pulled away as soon as the Defendant started shooting. He said he was in shock.

Mr. Phillips said that after the shooting, the Defendant got into the SUV and said, "That was my third, don't be fourth." He said he understood that if he said anything, the Defendant would kill him. He said the Defendant had a black, long-barrel .22 or .25 revolver in his hand. He acknowledged that he might have testified at the preliminary hearing that the gun looked like a .357 but stated that he never said it was a .357. He said that he was unable to describe how the Defendant acted but that he had "never seen anybody act like that." He said the Defendant drove away from the scene in the same direction as the Impala. He said that one of the women, whom he thought was Ms. Holtsclaw, called him crying and that he told her the Defendant said to go to the Defendant's mother's house. Mr. Phillips said the Defendant stated that the Defendant knew where Mr. Phillips's children went to school, that he knew where Mr. Phillips's parents lived, and that he would "take care" of Mr. Phillips's children. He said that they went to the Defendant's mother's house and that the Defendant said something to his mother like, "Momma, I got me one." Mr. Phillips said Ms. Harold and Ms. Holtsclaw were crying. He said that the Defendant had been wearing a black and white striped shirt and shiny, silky pants and that they were at the Defendant's mother's house long enough for the Defendant to obtain other clothes, which he estimated was fifteen to thirty minutes. He said that after the Defendant picked up other clothes, they went to Motel 6 in two vehicles. He said the Defendant and he followed the women, whom he said "left with directions [about] what to do."

Mr. Phillips testified that he checked into the motel under his name but that the Defendant paid. He said that the Defendant always had money and that the Defendant was proud of obtaining money by robbing drug dealers. He said that in the motel room, the Defendant told Ms. Harold, Ms. Holtsclaw, and him that he knew where their children went to school, that he knew where their mothers lived, and that he would kill them if they "snitched" on him. He said that the Defendant's demeanor was "[c]razy" while they were at the motel and that they were with the Defendant between twenty-four and forty-eight hours. He said he did not call the police or 9-1-1 because he had just seen the Defendant take a life and was scared. He did not recall going to Perkins Restaurant during the time they stayed at Motel 6.

Mr. Phillips said that when they checked out of Motel 6, he and the Defendant took a taxi to the Defendant's mother's house. He thought Ms. Harold and Ms. Holtsclaw arrived later. He said he called his sister to pick him up, and when he got in her car, the police pulled in behind the car.

Mr. Phillips testified that he did not tell the police the truth the first time he was interviewed because he was scared. He said he did not know where the Defendant was and had not seen the Defendant since the Defendant left the Defendant's mother's house with Ms. Harold and Ms. Holtsclaw earlier. Regarding his first police statement about the night of the offense, he said he falsely told the police that "Samantha" picked him up and took him to Sunoco. He said that after the first interview, he went to Ms. Holtsclaw's house, which was nearby, and spent the night with her. He was "sure" they talked about the incident.

Mr. Phillips testified that he told the truth in the second interview after the police proved the Defendant was in custody. He said he told them where the gun was based upon his having been told it was in a dumpster. He denied that his fingerprints were on the gun, but he later said it was possible his fingerprints were on the gun from a previous occasion he held it at the Defendant's mother's house. He said he helped the police recover the victim's t-shirt, which he had thrown out near the Boys and Girls Club at the Defendant's instruction. He also took the police to the dumpster where he had seen the Defendant go with a black trash bag, which is where he thought the gun might be. He took the police to a dumpster at the motel to look for the liquor bottles. He said he had not been afraid of the Defendant before the incident. He said he had been truthful in his testimony. He denied that he killed the victim because he was angry that the victim might spend the night with Ms. Harold.

Regarding his prior criminal record, Mr. Phillips testified that he had convictions for public intoxication, domestic violence involving his mother's ex-husband, "use of a credit card," and reckless endangerment. Relative to the present case, he said he had received an offer that allowed him to plead guilty to aggravated robbery and receive an eight-year

sentence, with the murder charge being dismissed, and that he had to testify truthfully in the Defendant's case.

Ginger Holtsclaw testified that she had been a friend of the Defendant for a couple of months before the shooting and that she had known Ms. Harold and Mr. Phillips for years. She said that on July 29, 2011, Ms. Harold, Mr. Phillips, the Defendant, and she were drinking heavily and "partying." She said they rode around and decided to go to Numan's late that night. She said that Mr. Phillips and the Defendant got out of the car and that she and Ms. Harold stayed in the car for ten to fifteen minutes. She said that the men were coming out of Numan's as she and Ms. Harold went inside and that the Defendant was angry. She heard inside Numan's that the Defendant had a disagreement with someone.

Ms. Holtsclaw testified that she and Ms. Harold met the victim, whom she had not seen previously, while they were at Numan's. She said they met him on the stairs as the bartenders were making him go downstairs, but she did not know the reason. She said that the victim had money, that he played pool, and that the three of them drank. She did not see or hear about any drugs. She said that a man asked her at Numan's where the Defendant was and that she told him she did not know. She said she went out Numan's back door and called the Defendant to tell him some men were looking for him. As she did, she saw the Defendant walking in front of a pawn shop but did not know what he was doing. She said that the victim, Ms. Harold, and she left together around 3:00 a.m. and that the victim and Ms. Harold were talking and "hooking up." She said she drove Ms. Harold's car when they left Numan's. She said that the three of them planned to smoke marijuana and that they discussed going to each person's house. She said they did not want to go to the victim's house because of the distance. She said she called to check motel prices, but they did not make a decision on their destination.

Ms. Holtsclaw testified that although she was very intoxicated that night, she recalled seeing the Defendant in an unfamiliar SUV parked behind a car wash when they were at Sunoco. She said he was "apparently following us." She said Ms. Harold and the victim went inside the convenience store for a few minutes. She said that she talked to the Defendant by cell phone and that he never got out of the SUV. She said they left when Ms. Harold and the victim returned to the car.

Ms. Holtsclaw testified that she drove when they left Sunoco. She said that although they had not made a decision, they were probably going to Ms. Harold's house and that because Ms. Holtsclaw was intoxicated, she drove on back roads to avoid the police. She saw the white SUV the Defendant was driving "[r]ight behind" the car. She said the Defendant flashed the headlights and blew the SUV's horn from King Springs to Quarry Road. She said that she stopped the car on Quarry Road but that in retrospect, she wished

she had not. She said the Defendant parked behind her and got out of the SUV. She said the Defendant wore shiny jeans and a striped polo shirt. She saw the victim get out of the driver's side rear door of the car and the Defendant shoot the victim several times. She said she knew from interactions with the Defendant earlier in the night that the Defendant was carrying a gun but had no idea he would shoot the victim. She said she heard someone, whom she thought was the Defendant, say, "You know what it is." She was certain she saw the shooting. Ms. Holtsclaw said that after the Defendant began shooting, she was afraid and drove away. She said she had not taken the victim somewhere in order for something to happen to him. She acknowledged that although she did not know what was going to happen when she stopped on Quarry Road, she "had an idea." She said she knew the kind of things the Defendant did but did not know the victim was a drug dealer.

Ms. Holtsclaw testified that she drove to the Defendant's mother's house but did not recall why. She said the events that happened at the house were "hazy." She said that the Defendant told his mother something like, "I got me one." Regarding what they did at the house, she said, "I guess we just basically were deciding what was going to happen from there." She described the Defendant as "pumped up." She said that the Defendant told them to calm down and that they needed to go somewhere to talk. She said they left, went to a store, and went to a motel. She said she had never seen the gun before the shooting, never saw it after the shooting, and did not know what happened to it. She said the Defendant had money that night, but she did not know the amount or its source. She was unaware of anyone's taking anything from the Defendant's mother's house.

Ms. Holtsclaw testified that they were at the motel "off and on" for a couple of days. She said that on the morning of the shooting, they went to Perkins Restaurant and that only the Defendant was able to eat. She said the Defendant told them that they had nothing to worry about if they kept their mouths shut. He warned them that he knew people, knew where their families lived, and knew where their children went to school. She said she never saw a gun and did not know if the Defendant had a bag of clothes at the motel. She said that the morning after the shooting, she was supposed to visit a jail inmate, but the Defendant would not allow it. She acknowledged they had cell phones and the room telephone at the motel but said the Defendant was in the room most of the time.

Ms. Holtsclaw testified that eventually, she and Ms. Harold left the motel in Ms. Harold's car. She was unsure how the Defendant and Mr. Phillips left, but she said they were at the Defendant's mother's house when she and Ms. Harold arrived. She regretted that she did not call the police.

Ms. Holtsclaw testified that she was detained by the police when she and Ms. Harold left the Defendant's mother's house. She said she was afraid and did not tell the truth when

-9-

the police questioned her. She said she told them "basically what we had come up with." She said Mr. Phillips was involved in concocting the fabricated story to a lesser extent than the Defendant, Ms. Harold, and herself. She said the story was that she and Ms. Harold took the victim from Numan's to a park to smoke marijuana and that he got into an SUV and left. She said they did not actually go to the park or smoke marijuana. She acknowledged she did not tell the police about what happened on Quarry Road and said she was sorry she lied. She said she eventually told the truth to the police because she could not live with herself. She said that she was relieved to have done so but that she was still afraid. She said that the incident ruined her life and that she told the truth in her testimony.

Ms. Holtsclaw testified that she had been untruthful in her general sessions court testimony when she said she had not seen the shooting and did not hear gunshots. She said she lied in that proceeding because she was incarcerated with the Defendant's sister and was afraid of what would happen when she returned to jail. She said that she had not always been honest in the past but that she had changed her life completely in the last three years. She acknowledged she had been caught twice for stealing. She acknowledged she lied to her probation officer and failed "a test" but said she was drinking and using drugs then.

Ms. Holtsclaw testified that she had been charged with first degree murder but that she had received a plea offer for dismissal of the charge in exchange for a guilty plea to facilitating armed robbery and a lesser sentence. She said the plea offer required that she testify truthfully in the Defendant's case.

George Gwinn, the owner of Reliable Imports, testified that on July 31, 2011, he noticed that a black Mercedes S500 and a white Ford Expedition SUV were missing from his business. Mr. Gwinn testified that two unopened, commemorative bottles of Maker's Mark bourbon with distinctive caps and a digital camera were taken from an office at the business. He said that the office window had been "jimmied" open and that a chair had been used to enter through the window. He said someone from a business one-fourth to one-half mile away alerted him that the Mercedes was in the business's parking lot and had a "blown" tire. He sent employees to look for the SUV, which was found at a Red Roof Inn. He said no keys were with the vehicles when they were found.

Johnson City Police Investigator Michael Barron testified about video recordings from security cameras at Sunoco and the car wash. He said the recording from Sunoco showed the victim and Ms. Harold come into view around 3:15 a.m. He said Mr. Phillips and a female relative were shown on the recording. He said the recording showed the victim and Ms. Harold leave the store around 3:23 a.m. He said it showed Mr. Phillips walk to the car wash.

Investigator Barron testified that the SUV came into view at 3:22 a.m. on the recording from the car wash. He said the driver wore a striped, dark polo shirt. He said that the recording showed the Impala leaving Sunoco's parking lot at 3:32 a.m., the Impala traveling south on South Roan Street, and the Expedition turning south onto South Roan Street.

Investigator Barron identified a Maker's Mark bottle with a blue cap, which he said the police recovered from trash that had been picked up at Motel 6. He said the police tried to locate the weapon used in the shooting but were told that it would be almost impossible because the trash had already gone to the landfill.

Investigator Barron testified that based upon information obtained from Ms. Harold, Ms. Holtsclaw, and Mr. Phillips, the police executed a search warrant at the Defendant's mother's house. He said they recovered a dark-colored, striped polo shirt from a pile of clothes in a bedroom, keys to the Expedition SUV and the Mercedes sedan taken from Reliable Imports, and a digital camera containing Mr. Gwinn's personal photographs and photographs of cars from Reliable Imports.

Investigator Barron testified that Ms. Holtsclaw's cell phone records reflected calls at 3:18 and 4:46 a.m. to Motel 6. He said the records also showed a 3:18 a.m. call to Marriott. He said the video recordings from Sunoco and the car wash did not show any contact between Ms. Harold and Mr. Phillips.

Johnson City Police Investigator Thomas Dillard testified that he collected evidence from the Expedition SUV. He found blood on the left front wheel well, the left rear wheel well, and a plastic piece on the undercarriage.

A Numan's bouncer testified that he made the victim leave the bar around 3:15 to 3:30 a.m. on July 30, 2011. He said the victim left with Ms. Holtsclaw and a woman in a sparkly dress. A Numan's bartender testified that she saw Ms. Holtsclaw and the victim playing pool at the bar on July 30. She said the victim had a large wad of money containing $100, $50, and $20 bills. She said another woman was with Ms. Holtsclaw and the victim when they came to the bar at one point in the evening. She said the victim accused the bartender's ex-boyfriend and her of stealing $100.

The Defendant gave three recorded statements to the police, and his telephone calls from the jail were recorded. The statements and some of the telephone calls were offered as evidence.

In the Defendant's July 31, 2011 statement, he said he was with Ms. Harold, Ms. Holtsclaw, and Mr. Phillips on Friday, July 29. He said they went "around town" but mostly stayed at Ms. Harold's house. Regarding their trip to Numan's, he was unsure of the time but estimated it was around 11:30 to midnight. He said he walked in, saw "Mookie," and left within ten minutes. He said he and Mookie had a disagreement about a PlayStation that Mookie thought the Defendant had stolen. He said he left Numan's on foot. He said that he had a BB gun with him on July 29, that he used it to scare people, and that he flashed it at Mookie. He said he was intoxicated. He said that he had tried to fight Mookie but that Mookie would not fight him. He said Mookie was the type of person who would shoot someone in the back. He said that he walked to a Texaco station and that he checked in at Motel 6 using Mr. Phillips's name. He said that he was alone but that people visited him.

When shown a photograph of the victim, the Defendant identified him as Goob. He said the victim and Dustin Scarlett did not like him. He said the victim did not like him "over some drugs" and that Mr. Scarlett made unfavorable statements to the victim about the Defendant. The Defendant asked if the victim was the person who had been killed, and when he was told the victim had been shot several times, he said "it ain't got nothing to do with" him. He said he had never killed anyone. He said the victim was "doing big things" involving pills. He said he, Mr. Scarlett, and the victim had been robbed at Mr. Scarlett's house. He was robbed of his money, and the victim was robbed of drugs.

The Defendant acknowledged he had violated the terms of his parole by leaving a halfway house after his mother's attempted suicide. While discussing whether he would be sent to jail for the parole violation, the Defendant stated that he could "solve" the victim's homicide. He also said he knew who committed a different shooting. He said he did not want his mother to die while he was in jail. The Defendant acknowledged he had been intimately involved with both Ms. Harold and Ms. Holtsclaw. He acknowledged his drug problem.

The Defendant's August 1, 2011 recorded interview was played for the jury. In it, the Defendant repeatedly denied killing anyone and said he did not drive the white SUV or another car. He said that he knew the car lot's owner and that he and his "buddy" owned the Mercedes at one point. He said that he was at Numan's for less than ten minutes, that he was intoxicated, that he saw people he did not like, that he and Mookie "got into it," that Mookie slapped him, that the Defendant displayed a BB gun, and that he did not know what time he left on foot. The Defendant said he walked to Texaco and obtained a ride from "the girls" to Motel 6. He said they checked into the motel and went to Perkins Restaurant. When asked what he did between approximately midnight and 4:30 a.m., he said he went to a store near Perkins to buy cigarettes and went to Sunoco with Mr. Phillips. He said that he "didn't get out" at Sunoco and that Mr. Phillips "got out" to get something to drink. Later in the

interview, however, he said he and Mr. Phillips went to Sunoco on foot from his mother's house earlier in the day. He said "Ashley and them" took him and Mr. Phillips to the store at which he bought cigarettes. He was unsure of the times and said he was under the influence of alcohol and pills. When asked about the victim, the Defendant said he knew the victim as Goob from drug deals. He said that the victim was a "big time" drug dealer and that the victim used drugs. When asked why three people would implicate him, he said they were lying and denied killing anyone.

The Defendant participated in another interview on August 3, 2011, and the recording was played for the jury. Regarding the night of the crime, the Defendant stated that he and his mother had been drinking and taking pills. When told of a video recording showing him in an Expedition a few minutes before the victim was found dead, he said he was in a black car and that another person, whom he identified only has "he," wanted to talk to the person's sister. He said that he went to a "roofing place or some s--- over by the parole thing" and that he got out of the car with "that dude." He denied disposing of a gun. He said that he had been walking and was picked up by "Ginger, girl and Anthony" and that they went straight to the motel. He said that Anthony paid at the motel and that he had lied when he said he paid. He claimed no knowledge of what the others had done before picking him up.

As the August 3 interview continued, the Defendant stated that initially, he did not want to be "charged with the cars," but he admitted he broke into the office at the car lot. He said that he took the Mercedes and that "what-cha-ma-call-it" took the "white thing." He said that the Mercedes was not operating properly, that he went around the block because he was going to "break into some places," that he pulled over, and that he fell asleep. He said Mr. Phillips and "them" picked him up. He said Mr. Phillips was in the SUV and "they" were in a separate car. He said Mr. Phillips had "been driving around trying to hit licks and s---." He said they "went to the store." He said that "they" were talking about how "they got somebody from Numan's" and that he stated he wanted to go to his mother's house. He said that "[t]hey" dropped him off at his mother's house, that they returned thirty minutes to one hour later, and that they were talking about going to a motel and Perkins. He denied having a "real" gun and killing the victim. When advised that his mother told the police the Defendant had a real gun at her house, the Defendant said the only gun he had shown her was his BB gun.

When questioned further during the August 3 interview about the trip to Sunoco in the SUV, the Defendant acknowledged he had driven. He said he had driven from "Johnson City Press to about right there" and then went to his mother's house.

In an August 12, 2011 recorded telephone call from the jail, a female advised the Defendant of rumors that someone other than the Defendant committed the homicide. They

discussed the previous robbery incident in which the Defendant was a victim. In a September 17, 2011 recorded telephone call, the Defendant denied any wrongdoing. In a November 5, 2011 recorded telephone call, the Defendant told a male that "Anthony" stated "that dude George" bought drugs from the Defendant. He said Anthony "snitched on" the Defendant. The Defendant said, "I am going to get my money . . . . I'll ride with drug dealers . . . but I ain't kill nobody."

The Defendant testified that although he was sorry for the victim's family's loss, he was not a killer. He acknowledged he had a bad past and had stolen, robbed, and used drugs, but he stated he would not hurt anyone. He testified that sometime before the night of the incident, he had been robbed at Dustin Scarlett's house. He said that he had told some people where to get pills and that they had come to Mr. Scarlett's house and robbed Mr. Scarlett and him. He said that when he found out who was responsible, he robbed the person.

Regarding the night of the incident, the Defendant testified that he went briefly to Numan's, where he had a discussion with Mookie. He said he showed Mookie his BB gun because he wanted to scare Mookie. He said he left on foot and tried to call George Gwinn, whom he said owed him money for drugs. He said he told Mr. Gwinn that he was going to start stealing rims unless Mr. Gwinn paid him. He said Mr. Phillips was with him at this point but did not identify the point at which Mr. Phillips joined him. The Defendant said that he did not break into the office at the car lot but that he knew where the keys were. He said that he stole the Mercedes, that Mr. Phillips stole the SUV, and that he took the cars because Mr. Gwinn owed him money. He said that something was wrong with a tire on the Mercedes and that he parked it. He called Mr. Phillips, who picked him up in the SUV. The Defendant said that they rode around and that at some point, the Defendant told Mr. Phillips he wanted to drive. The Defendant said that Mr. Phillips wanted to get something to drink and that the Defendant drove to a car wash by Sunoco, which he said was where Mr. Phillips wanted to park. He acknowledged that he was high from ingesting pills and that he should not have been driving. He said that he sat in the SUV at the car wash, that he saw a car pull in, and that the victim and Ms. Harold got out. He later said he did not know if he and Mr. Phillips or the people in the Impala arrived first. He denied talking to Ms. Holtsclaw by cell phone when she, Ms. Harold, and the victim were at Sunoco. He said he had not realized at the time that the victim was the person with Ms. Harold and Ms. Holtsclaw. He acknowledged, though, that he had spent an evening with the victim and had completed six or seven drug transactions with the victim. He said he was not feeling well and told Mr. Phillips he wanted to go home to see his mother.

The Defendant testified that when he left the car wash, he drove in the opposite direction from Quarry Road. He said Mr. Phillips wanted to borrow the SUV. The Defendant said that he told Mr. Phillips he could use the car but that the Defendant needed

it back by morning.  The Defendant said he did not tell Mr. Phillips he had seen Ms. Harold and the victim together.

The Defendant testified that he had been at his mother's house for about forty-five minutes when Mr. Phillips, Ms. Harold, and Ms. Holtsclaw arrived.  He said that they did not mention the victim, that they wanted to go to a motel, and that he went to Motel 6 with them.  The Defendant said that Mr. Phillips drove the SUV, that Mr. Phillips checked in at Motel 6, and that the Defendant parked the SUV at Red Roof Inn.  The Defendant said Ms. Harold and Ms. Holtsclaw left to buy rolling papers and cigarettes.  He said the four of them smoked marijuana, ingested pills, and went to Perkins Restaurant.  He said that they were in the motel room for about thirty hours over two days and that Ms. Harold, Ms. Holtsclaw, and Mr. Phillips left at times.  He said he had a female visitor at the motel's pool.  The Defendant did not know why Mr. Phillips stated he was afraid of the Defendant.  The Defendant said he did not force anyone to stay at the motel or threaten anyone.  He said he and Mr. Phillips took a taxi from Motel 6 to his mother's house.  He said that before they left the motel, Mr. Phillips bragged, stating, "I got me one.  I'm a killer."  He said he thought Mr. Phillips was lying.  The Defendant said he and Mr. Phillips were alike because they both carried guns and robbed people.

The Defendant testified that Ms. Harold and Ms. Holtsclaw arrived at his mother's house after Mr. Phillips and him and that he had not called them.  He said that he asked them to take him to the store for cigarettes and to visit his daughter and that they were stopped by the police before they reached the store.  He said he was arrested for violation of parole from previous theft and burglary convictions.

The Defendant testified that he did not hurt or kill people.  He said, though, that he stole, committed robberies, and did "stupid s---" due to his drug habit, women, and the wrong reasons.

The Defendant testified that he had not been on Quarry Road except in passing and when he was in a juvenile group home.  He said that his codefendants' statements about his flashing the SUV's lights to get Ms. Holtsclaw to stop the Impala were false and that he never drove the SUV behind the Impala.  He said Mr. Phillips lied when Mr. Phillips said the Defendant grabbed the victim by the arm, pulled the victim, and shot the victim at close range.  He denied that he told his codefendants what to say or that he told them to go to the park and smoke marijuana with the victim.  He denied threatening to kill them or their families.

The Defendant testified that Ms. Harold and Ms. Holtsclaw were his "friends with benefits."  He said he never had any problems with them or with Mr. Phillips.  He said they,

not he, killed the victim, although he had not suspected it at first when they were at the motel together. He said that he knew the truth when he was interviewed on July 31, 2011, but that he did not tell the police, nor did he tell them in his August 1 or August 3 interviews. He said he did not admit to taking the vehicles at first because he knew he would get a lengthy sentence.

When asked about a statement in a recorded jail telephone call in which the Defendant said something about pulling a gun on Mookie, he said he was referring to the BB gun. He said that he had shown Mookie the BB gun because he wanted Mookie to come outside Numan's and fight and that Mookie would not, but he denied that he took out his frustrations with Mookie on the victim. When asked about a statement in one of the jail calls that he "robbed the dude," he said he was referring to robbing a drug dealer.

The Defendant acknowledged that he had written to the district attorney and asked for a plea offer. In the letter, which he read during redirect examination, he stated that he did not murder the victim but that he had been in jail for two and one-half years and wanted to get the matter behind him. The Defendant testified that he was sorry for the victim's family's loss and that he wrote the letter because he wanted to conclude the case despite his not having killed the victim.

After receiving the proof, the jury found the Defendant guilty of first degree premeditated murder. This appeal followed.

## I

The Defendant contends that the evidence is legally insufficient to support his conviction, that the evidence is insufficient to support the verdict, and that the verdict is contrary to the law and the evidence. We view all of these issues as encompassed in the question of the sufficiency of the evidence to support the conviction and will consider them as such.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier

of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992).

Regarding the events after the Defendant and the codefendants left Numan's, Mr. Phillips testified that the Defendant told him they were going to get some pills from Goob. Mr. Phillips said the Defendant received a call from Ms. Holtsclaw, who said to meet at Sunoco. The testimony of Mr. Phillips and the Defendant shows that the Defendant parked at a car wash near Sunoco until the Impala left. Ms. Holtsclaw testified that she and the Defendant talked by cell phone while she was at Sunoco. Mr. Phillips testified that the Defendant followed the Impala when Ms. Holtsclaw drove away from Sunoco, and the video evidence supports his testimony. Mr. Phillips testified that when he and the Defendant left, the Defendant told Ms. Holtsclaw by cell phone where to go. Mr. Phillips and Ms. Holtsclaw

-17-

also said that the Defendant drove the stolen SUV and flashed bright lights at the Impala to get Ms. Holtsclaw to stop on Quarry Road. The codefendants all identified the Defendant as the person who got out of the SUV, went to the driver's side rear door of the Impala, shot as soon as the victim stood, and continued firing shots at the victim. The physical evidence shows that the victim had eight gunshot wounds. It likewise shows that the victim was run over by the SUV, which the codefendants' testimony and the video evidence establish that the Defendant was driving. The codefendants testified that the Defendant threatened them and their families and told them what to say if they were questioned by the police. From these facts, a rational trier of fact could find beyond a reasonable doubt that the Defendant committed an unlawful, intentional, and premeditated killing of the victim.

To the extent the Defendant argues that the codefendants were not credible witnesses, that they had been friends with each other for much longer than with him, and that they had opportunities after the crime to concoct a false story that implicated him, we note that the function the jury, not this court, is to evaluate matters of witness credibility. The jury had the opportunity to observe the codefendants' demeanor and hear their sworn testimony. The facts regarding the codefendants' and the Defendant's previous friendships were evidence the jury considered.

We also have considered the Defendant's contention that his codefendants were accomplices whose testimony was inadequately corroborated. "An accomplice is defined as a person who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). "[A] conviction may not be based solely upon the uncorroborated testimony of an accomplice." *See, e.g.*, *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886 (Tenn. 2013). In order for accomplice testimony to be adequately corroborated:

> there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

-18-

*Bigbee*, 885 S.W.2d at 803 (quoting *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992) (citations omitted)); *see Shaw*, 37 S.W.3d at 903.

> Regarding the question of whether a person is an accomplice,

> The term "accomplice" does not include a person who has guilty knowledge, or is morally delinquent, or who was even an admitted participant in a related but distinct offense. To constitute one an accomplice, he must perform some act or take some part in the commission of the crime or owe some duty to the person in danger that makes incumbent on him to prevent its commission. An accomplice is "one culpably implicated in, or who unlawfully co-operates, aids, abets, or assists in, the commission of the crime charged."

> The generally accepted test as to whether a witness is an accomplice is whether he himself could have been convicted for the offense, either as principal or accessory.

*Pennington v. State*, 478 S.W.2d 892, 898 (Tenn. Crim. App. 1971) (quoting 2 Wharton's Criminal Evidence § 448 (12th ed. 1955)). A person is not deemed an accomplice simply because he or she was present at the crime scene. *Letner v. State*, 512 S.W.2d 643, 647 (Tenn. Crim. App. 1974); *Hicks v. State*, 149 S.W. 1055, 1056 (Tenn. 1912).

The codefendants' indictments are not in the record. Ms. Harold testified that she did not have a plea agreement with the State and that she would probably go to trial because she was not guilty of anything, although she was not asked to identify the offenses with which she was charged. Ms. Holtsclaw testified that she was charged with first degree murder but not robbery and that her plea agreement permitted her to plead guilty to "facilitation of armed robbery or something like that" and would result in dismissal of the murder charge. Mr. Phillips said he had a plea agreement to plead guilty to aggravated robbery and have his murder charge dismissed. The Defendant was not charged with robbery, and although he was charged with first degree felony murder based upon the allegation he killed the victim in the perpetration of robbery or attempted robbery, this count was dismissed upon his motion for judgment of acquittal at the close of the State's proof. Thus, the only offense the jury considered was first degree premeditated murder.

We believe it is significant that the Defendant did not stand trial for robbery of the victim. We note the lack of evidence that the codefendants had any knowledge of or participation in furtherance of the homicide. At most, the evidence could be viewed to suggest their knowledge of or participation in a robbery or that they were accessories after the fact to the homicide. As we have stated, neither mere presence at the crime scene nor

-19-

participation in a distinct but related offense confers accomplice status upon a person. We are mindful that "'[t]he question of who are accomplices is one of law for the court when the facts as to the witness' participation are clear and undisputed; when such facts are disputed or susceptible of different inferences, the question is one of fact for the jury.'" *Ripley v. State*, 227 S.W.2d 26, 29 (Tenn. 1950) (quoting 22 C.J.S., Criminal Law, § 797, p. 1348). In the present case, we view the evidence as supporting only one interpretation: the codefendants did not "knowingly, voluntarily and with common intent" unite with the Defendant in the commission of first degree murder. *See Anderson*, 985 S.W.2d at 16. For this reason, the testimony of Ms. Harold, Ms. Holtsclaw, and Mr. Phillips did not require corroboration. The Defendant's argument that the evidence is insufficient because of inadequate corroboration of accomplice testimony must fail. He is not entitled to relief on this basis.

## II

The Defendant contends that the trial court erred in failing to instruct the jury on corroboration of accomplice testimony. He concedes that defense counsel did not request the instruction but urges us to grant relief as a matter of plain error.

The trial court in a criminal case is required to give "a complete charge of the law applicable to the facts of the case[.]" *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975). "[T]he defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." *Id.* The right is constitutional in nature. *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990), *superseded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247, 291 (Tenn. 2002). Our supreme court, however, has said an instruction regarding corroboration of accomplice testimony is not fundamental to the defense. *State v. Bough*, 152 S.W.3d 453, 464-65 (Tenn. 2004) (citing *Anderson*, 985 S.W.2d at 17); *Monts*, 379 S.W.2d at 42; *Arterburn v. State*, 344 S.W.2d 362, 364 (Tenn. 1961).

> Upon the trial court's failure to instruct the jury regarding accomplice testimony and the requirement of corroboration, it becomes the obligation of the defendant to make a special request for the instruction. . . . In the absence of a special request, the trial court does not err by failing to instruct the jury about accomplice testimony even if the circumstances of the case warrant such an instruction.

*Anderson*, 985 S.W.2d at 17; *see Bough*, 152 S.W.3d at 464-65.

As we have noted, no evidence exists to support a conclusion that Ms. Harold, Ms. Holtsclaw, and Mr. Phillips were accomplices to the first degree premeditated murder of the victim. Even if the evidence had supported a jury instruction regarding accomplice testimony corroboration, upon the trial court's failure to give the instruction, the obligation was on the Defendant to request it. The record does not reflect a request. Our supreme court has said that a trial court does not err in failing to give the corroboration instruction in an appropriate factual scenario if a defendant has not requested the instruction. Because the trial court's lack of a corroboration instruction is not considered to be error, the Defendant is not entitled to relief on this basis.

The judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE